UNITED STATES of America,

v.

**Demetrious PAPADAKIS, Defendant.**

No. SS 83 Cr. 68.

United States District Court,
S.D. New York.

Oct. 17, 1983.

On Second Motion For Declaration of
Unavailable Witness Nov. 16, 1983.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Ira H. Block, Bruce Green, Asst. U.S. Attys., New York City, of counsel.

Martin L. Schmukler, New York City, for defendant Demetrious Papadakis.

Michael Washor, New York City, for defendant Steve Argitakos.

Arnold D. Roseman, New York City, for defendant Christos Potamitis.

Joel Winograd, New York City, for defendant Eddie Argitakos.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner Demetrious Papadakis, and co-defendants Christos Potamitis, Eddie Argitakos, Nicholas Gregory, and Steve Argitakos, are accused of conspiring to steal money and other valuable property from the Sentry Armored Courier Corporation ("Sentry"), in Bronx, New York. In addition, Papadakis, Potamitis, Gregory, and Eddie Argitakos are accused of the substantive offenses of stealing property belonging to various banks (the deposits of which are insured by the Federal Deposit Insurance Corporation), as well as food stamps, from Sentry on December 12, 1982, and transporting the proceeds of the larceny in interstate commerce. Steve Argitakos is further charged with aiding and abetting his codefendants and acting as an accessory after the fact by concealing the proceeds of the larceny from law enforcement officials. Papadakis now moves, pursuant to Fed.R. Crim.P. 14, for a separate trial from his codefendants, upon an allegation that his defense will be so antagonistic to, and irreconcilable with, the defenses he anticipates that Eddie and Steve Argitakos will offer that he will be unduly prejudiced and denied a fair trial if tried with them.

To sustain its burden of proof against Papadakis, the government has indicated that it will offer at least the following evidence: (1) on November 27, 1982, Papadakis participated in a discussion with Eddie Argitakos and George Legakis (who is not named as a defendant in the indictment) about a "stake-out" of Sentry; (2) at various times in the course of the conspiracy, codefendants Eddie Argitakos and Gregory identified Papadakis as a member of the conspiracy; (3) Papadakis has a long-standing close personal relationship with codefendant Gregory; (4) following the December 12th larceny, the FBI found $379,000 of the proceeds of the larceny in the home of Papadakis' in-laws, Mr. and Mrs. Skiadas, to which Papadakis had a key and where he often visited.

Papadakis, through his attorney, asserts that he will not contest that there was a conspiracy to steal, or that the substantive offenses were committed, but will deny that he played any part in either. Papadakis has not indicated, as is his right, whether he will testify at his trial. To resist the government's charges, it appears that Papadakis will rely upon evidence that Steve Argitakos is the brother of Mrs. Skiadas (Papadakis' mother-in-law) and that he listed the Skiadas home as his residence in applying for a Connecticut driver's license. Based upon that evidence, Papadakis' attorney intends to urge upon the jury that Steve Argitakos and his son Eddie, the nephew of Mrs. Skiadas, also had access to the Skiadas home and that a reasonable inference is that the Argitakoses, not Papadakis, secreted the stolen proceeds there. Further, Papadakis' attorney states that he will seek to impeach Eddie Argitakos' alleged statements that Papadakis was a member of the conspiracy. Papadakis anticipates, based on conversations with their counsel, that the Argitakoses will either point the accusing finger back at Papadakis, or that they will deny that there was a larceny and argue that the money was instead embezzled by another defendant or by unknown persons. In either event, Papadakis claims that his defense is so irreconcilable with the defenses that he believes Steve and Eddie Argitakos will offer that a severance is warranted.

■ The petitioner's claim for severance is without merit. As a general rule, persons jointly indicted should be tried together, "particularly so where the indictment charges a conspiracy or a crime which may be proved against all the defendants by the same evidence and which results from the same or a similar series of acts."[1] While a joint trial may not be held at the expense of a defendant's right to a fair trial, "the public interest in avoiding duplicitous, time-consuming, and expensive trials is such that separate trials of jointly indicted defend-

---

1. *United States v. Kahaner,* 203 F.Supp. 78, 80–81 (S.D.N.Y.1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). *See also United States v. Corr, III,* 543 F.2d 1042, 1052 (2d Cir.1976).

ants ... should be granted only when it appears that a joint trial will prejudice one or more defendants."[2] A party claiming prejudice must show more than mere hostility between one or more defendants; indeed, he must do more than merely anticipate that one defendant may try to save himself at the expense of another.[3] Instead, to establish a level of antagonism between the defenses of the codefendants that compels severance, petitioner must show that "the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant."[4] Such is not the case here.

█ Papadakis has not shown the required level of antagonism between him and the Argitakoses. The jury need not disbelieve one in order to believe the other. Instead, the jury could disbelieve the defenses of both Papadakis and the Argitakoses and find that each of them played a role in placing the money in the Skiadas

home. Or the jury could believe that neither Papadakis nor the Argitakoses placed the money at the Skiadas home, but nevertheless find that one or all of them played some role in aiding the concealment.[5]

Further, the jury could believe Papadakis' assertion that it was the Argitakoses who placed the money in the Skiadas home, and that Papadakis played no role in that concealment, yet still find Papadakis guilty of the conspiracy and substantive crimes. Papadakis' attempt to clear his name by accusing the Argitakoses rests entirely upon an assumption that because Steve Argitakos listed the Skiadas address as his own in his driver's license application, and because he is related to Mrs. Skiadas, he and his son had access to the Skiadas home. There is not, on this motion, evidential support for this assumption. The government makes no claim that the Argitakoses had access to the Skiadas home. To the contrary, it contends its proof will be directed to Papadakis and asserts that while it has no direct proof

---

**2.** *Kahaner, supra* note 1, at 81.

**3.** *Id.*

**4.** *United States v. Carpentier,* 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983), *quoting United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981).

**5.** Petitioner's attempts to analogize to *United States v. Crawford,* 581 F.2d 489 (5th Cir.1978), and *United States v. De Luna,* 308 F.2d 140 (5th Cir.1962) are not convincing. In *Crawford,* two codefendants were charged with possessing an unregistered sawed-off shotgun that had been found in their automobile. Each contended that the other owned the gun, and the Fifth Circuit held that severance was necessary because the defenses were "mutually exclusive"—the sole defense of each was the guilt of the other. *Crawford, supra,* at 492. Similarly, in *De Luna,* two cousins were charged with the possession of narcotics that were thrown from the car in which the two were riding. One codefendant charged that the drugs belonged to the other, who did not take the stand. In such a case, severance is warranted, because "where someone must have possessed the contraband, and one defendant can only deny his own possession by attributing possession and consequent guilt to the other, the defenses are antagonistic." *United States v. Ziperstein,* 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

In contrast, proving that the Argitakoses are guilty will not necessarily clear Papadakis' name—all three may be found guilty. *Cf. Crawford, supra,* at 492 (Clark, J. dissenting). Similarly, petitioner's reliance on *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983), and *United States v. Johnson,* 478 F.2d 1129 (5th Cir.1973), is misplaced. In *Kopituk,* employers and union officials were charged with racketeering, conspiracy to racketeer, and extortion, among other things, upon allegations that the employers made illegal payoffs to the union officials in return for assured labor peace and lucrative business contracts. Severance was granted because one of the employers planned to admit making the illegal payments to his codefendants, but to claim that he did so under economic duress. His defense was held to be irreconcilable with the union officials' defense that no payoffs were made. In *Johnson,* two codefendants were charged with passing counterfeit Federal Reserve notes. Johnson's defense was that he was not present when the notes were passed. His codefendant's defense, however, was that he and Johnson had indeed passed the notes, but that he had done so only because he was a police informer trying to secure evidence against Johnson. Thus, in both *Kopituk* and *Johnson,* one defendant was relying on the guilt of his codefendant to excuse his own conceded wrongdoing. *Cf. Ziperstein, supra* note 5, at 286 n. 1. Papadakis offers no such defense.

that Papadakis placed the money in the Skiadas home, it will rely on the expected testimony of the Skiadases that (1) they were unaware of the presence of the money in their home; (2) it was found in an area of the house that is not generally accessible; (3) there had been no break-ins at their home from December 12, 1982 (the date of the larceny) through February 7, 1983 (the date the money was discovered in the home); and (4) the only persons with access to the house were their two daughters and Papadakis, their son-in-law. Even assuming that the jury will draw the inference Papadakis urges rather than believe the expected testimony of the Skiadases, the jury would have other evidence upon which it could find Papadakis guilty of the conspiracy and the substantive crimes. The link between Papadakis and the money found in the Skiadas home is but one link in the chain of the evidence against Papadakis. The remainder of the evidence is not insubstantial. As noted above, the government intends to prove that prior to the alleged larceny, Papadakis participated in at least one discussion about a "stake-out" at Sentry, and that Papadakis was identified by other alleged co-conspirators as a member of the conspiracy. The jury could find Papadakis guilty upon that evidence, without regard to whether the Argitakoses or any other person placed the money in the Skiadas residence.

In sum, the crux of Papadakis' defense apparently will be that the evidence is insufficient to establish his participation in the conspiracy or the larceny. Similarly, the Argitakoses are expected to argue that there is insufficient evidence to sustain the charges against them. While the three may completely disagree on a detail of the facts—who had access to the Skiadas home and concealed proceeds of the larceny there—the "essence or core of each defendant's defense—non-involvement in criminal activity—[is] not in conflict." [6] The jury could accept the defense theories of both Papadakis and the Argitakoses, or of only one, or of neither; accordingly, Papadakis will not suffer sufficient prejudice to compel severance.

■ Petitioner, on the eve of trial, also urges that a severance is necessary because he needs time to locate Steve Panagopolous, who testified before the Grand Jury and upon whose testimony Count Five of the indictment, charging Steve Argitakos with concealment of another portion of the proceeds of the Sentry theft in East Greenbush, New York, is based. Papadakis asserts that Panagopolous' testimony is essential because it would give support to his claim that it was one of the Argitakoses, not Papadakis, who placed the stolen proceeds in the Skiadas home. Long before Papadakis' belated claim that Panagopolous is a material witness in support of his defense, the government had urged that he was a material witness for the prosecution with respect to Count Five; in fact, at its request, several adjournments were granted pending its efforts to locate and effect the return of Panagopolous, who made an unexpected trip to Greece in May 1982, soon after he testified before the Grand Jury.[7] It is not known whether he left the United States (and his wife and child) because of threats or fear for his safety. Thus far the efforts of the State and Justice Departments to locate him in Greece have been unsuccessful. Since it appears he is unavailable, despite continued governmental efforts, there is no basis for indefinite delay. Papadakis has offered no evidence to indicate that he will be more successful in locating Panagopolous and securing his attendance as a witness than the government has been. Moreover, as noted above, testimony from Panagopolous or others tending to indicate that Steve Argitakos played a role in the larceny or in the concealment of its proceeds will not necessarily prove that Papadakis is innocent. Indeed, Panagopolous' testimony relates only to money allegedly concealed in East Greenbush, not to the money found in the Skiadas home— which is the issue upon which Papadakis

6. *Berkowitz, supra* note 4, at 1134. *See also United States v. Singer,* 687 F.2d 1135 (8th Cir.1980).

7. *See United States v. Potamitis,* 564 F.Supp. 1484 (S.D.N.Y.1983).

anticipates that he will be at odds with the Argitakoses. In addition, the government maintains that it will attempt to offer into evidence Panagopolous' grand jury testimony, and that even without that testimony, it has sufficient other evidence to prove Argitakos' guilt.

The motion for severance is denied.

## On Second Motion For Declaration of Unavailable Witness

EDWARD WEINFELD, District Judge.

Familiarity is assumed with this Court's ruling on June 8, 1983, which declared Steve Panagopolous an essential and unavailable witness, postponed the commencement of trial to permit the government to undertake proceedings for his return from the Republic of Greece to secure his live testimony at this trial, and excluded the time required for those proceedings from Speedy Trial Act computations.[1] The Court in due course issued a subpoena for his further appearance before the grand jury and later at the trial.[2] Despite efforts by the State and Justice Departments, service of the subpoena has not been effected upon him. The trial proper against Steve Argitakos and the three codefendants has been in progress for more than three weeks and it is estimated will take another week or ten days before it is concluded.

The instant motion is by the government again to declare Steve Panagopolous an unavailable witness and to admit his grand jury testimony into evidence against Steve Argitakos upon the ground that by his acts and course of conduct Argitakos is responsible for the unavailability of the witness and has thereby waived his constitutional right of confrontation under the Sixth Amendment.[3] The motion is opposed by Steve Argitakos, as well as the other defendants. The trial was interrupted by a voir dire

hearing on the issues presented by the government's motion. Joanna Panagopolous, the wife of Steve Panagopolous, and two enforcement agents testified. In addition, there was received in evidence her grand jury testimony, that of her absent husband and stipulated matters.

A brief reference to this Court's prior ruling indicates that early in January 1983, some three weeks after the Sentry robbery, Steve Argitakos stopped off at a diner owned and operated by Steve Panagopolous, his friend, at East Greenbush, New York, a suburb of Albany. After a brief social chat, Argitakos requested of and was given permission by Panagopolous to leave a padlocked trunk in the garage of the Panagopolous home, located near the diner, pending his return from a trip to Montreal. On February 7, 1983, the news media, including an Albany paper, reported the arrest of Eddie Argitakos, Steve Argitakos' son, in connection with the Sentry robbery; at about the same time there was also publicity about currency being found at a Westport, Connecticut home which allegedly was related to the Sentry robbery. Panagopolous became concerned about the trunk in his garage, consulted an attorney, and as a result the trunk was turned over to the FBI. The trunk was searched pursuant to a warrant and was found to contain about $392,000 in currency, which the prosecution contends is part of the proceeds of the Sentry theft. Steve Panagopolous testified before the grand jury with respect to the circumstances under which the trunk was stored in the garage. Thereafter Steve Argitakos was named in a superseding indictment as a co-conspirator under one count and an accessory after the fact under a separate count. Obviously the testimony

1. *United States v. Potamitis,* 564 F.Supp. 1484 (S.D.N.Y.1983).

2. Panagopolous is a naturalized citizen and subject to service of a subpoena requiring his appearance in the United States courts. 28 U.S.C. § 1783(a) (1966). However, as a native born Greek citizen, his return under existing extradition treaties is stated to be a matter of discretion by the Greek government.

3. *See United States v. Mastrangelo,* 693 F.2d 269 (2d Cir.1982). *Accord United States v. Thevis,* 665 F.2d 616, 630–31 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Balano,* 618 F.2d 624, 628–30 (10th Cir.1979), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *United States v. Carlson,* 547 F.2d 1346, 1357–60 (8th Cir.), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

of Panagopolous is essential with respect to the charges against him.

■ The defendant first challenges the government's motion on the ground that the prosecution did not exert its full resources in its efforts to locate Steve Panagopolous in Greece. He departed for Greece on May 4, 1983, leaving behind his wife, his nine year old son and his business. He has been gone now more than six months. He occasionally telephones his wife from abroad, but has never given her information as to his whereabouts. She has not asked him in order not to become possessed of this knowledge because, as she testified, she does not want "to lie against the law" or to the FBI in the event she is asked about his whereabouts.[4]

The government's efforts to locate Panagopolous were coordinated by the United States Embassy in Athens, Greece. Embassy personnel visited, and spoke with, Panagopolous' brother Demetrious and his wife several times, both at their home and at their business, and left with them a copy of the grand jury subpoena, and later, of the trial subpoena. Embassy personnel also visited and phoned Panagopolous' other brother, Panagiotis, and similarly left a copy of the grand jury subpoena, then of the trial subpoena, at his home.

In addition, the Embassy engaged the services of court bailiffs, the Greek equivalent of professional process servers. One bailiff interviewed neighbors of Panagopolous' brother Panagiotis, and spoke to Panagiotis' wife twice about Panagopolous' whereabouts. He spoke as well to Demetrious' wife. Upon being told that Panagopolous was in the village of Andritsena, the bailiff enlisted the help of police in that village. In addition, the bailiff spoke with the mother-in-law of Panagiotis, who accepted copies of the grand jury subpoena

and signed a statement indicating that she would undertake to deliver the papers to Panagopolous. Bailiffs also visited the home of Panagopolous' mother-in-law in the town of Kalamata twice, leaving a copy of the trial subpoena on the second visit. Bailiffs also visited every family in the town of Kalamata that had the Panagopolous surname.

The defendant taxes the foregoing as inadequate. He urges that the government should have sent trained FBI and other enforcement agents to Greece to search for and locate the missing witness. However, the law does not require that a posse be sent to a foreign country to secure a witness' appearance in a United States court. What is required under the Confrontation Clause is that the prosecution make a "good faith effort" to obtain the witness' presence at the trial.[5] Here the efforts of government officials to locate the missing witness, already described, readily meet the appropriate good faith requirement. Having satisfied that test, the next issue to be considered, unless waived by a defendant, is whether the proffered statement possesses sufficient indicia of reliability to warrant its submission to the jury even though the witness has not been confronted by the defendant or subjected to face examination and cross examination before the jury, thus affording it the opportunity to judge his demeanor.[6]

■ We first consider the government's major contention that Panagopolous' unavailability is the result of Steve Argitakos' acts and conduct. Panagopolous testified before the grand jury on March 2, 1983. In addition to the details of the circumstances under which the locker was left at his home, Panagopolous testified that he was afraid about the "safety to my wife, safety for my family, and my business."[7] There

4. Trial transcript at 2752, *United States v. Potamitis*, No. 83 Cr. 68 (S.D.N.Y. November 11, 1983).

5. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See also Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Barber v.*

*Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

6. *Ohio v. Roberts, supra* note 5. *See also California v. Green, supra* note 5, at 158–59.

7. Grand Jury Testimony of Steve Panagopolous at 39, *In Re: Sentry* (S.D.N.Y. March 2, 1983).

can be no doubt that at this time he was greatly concerned and distressed by the turn of events. Both Panagopolous and Argitakos were members of a rather cloistered community of former Greek nationals. Panagopolous considered himself a close friend of Steve Argitakos, to whom he had extended an ordinary courtesy in consenting that the padlocked trunk be left in the garage pending Argitakos' return from a trip. Panagopolous' grand jury testimony indicates that he did not wish to hurt his friend but found it difficult to accept that his friend could have placed him in a questionable position. Further, due to publicity in Greek language papers as well as the regular news media, he feared some in the Greek community might think he was somehow involved in the theft and others might question his loyalty to a friend because he had turned the trunk over to the authorities. The grand jury testimony leaves no room to doubt that the witness was not only deeply troubled by the situation in which he was unwittingly cast, but was in fear for the safety of himself and family.

It is against this background of mental anguish that subsequent events must be viewed in deciding the cause of Panagopolous' unavailability. The defendant Argitakos contends that Panagopolous left the United States voluntarily because he was mentally upset and troubled by the Greek community's likely attitude toward him, and that his departure and absence was unrelated to any act or conduct of Argitakos. The government, on the other hand, contends that the witness left this country, where he resided for at least fourteen years without interruption for visits to his native land, and virtually abandoned his wife, his child and business under fear induced by the threats of Argitakos, either expressly stated or implicitly conveyed by him or others acting on his behalf.

On April 15, 1983, when the superseding indictment naming Steve Argitakos was returned, he was then in Greece. At that time he was aware of the imminency of his indictment. Two days later, on April 17, 1983, Steve Argitakos' brother-in-law, accompanied by his wife and their daughter, residents of Astoria Queens, New York, stopped at the Panagopolous diner, some 150 miles distant from the city and informed Panagopolous that Steve Argitakos wanted to see him in Greece. He was told "you must go and meet him."[8] The Panagopolouses decided that because the FBI investigation was still ongoing and because they were concerned for his safety, Mrs. Panagopolous was to go in his place. She arrived in Greece with her child on April 20 and was met at the Athens airport by Steve Argitakos. He first inquired why her husband had not come and she stated that he was being watched by the FBI. They then engaged in a four or five hour discussion which centered on Argitakos leaving the trunk at the Panagopolous home, its delivery to the FBI, the pending proceedings and the problems created in their wake. During the course of this extended conversation Steve Argitakos told her he had asked Panagopolous' brothers, residents of Greece, to go to the United States to tell Panagopolous that "Steve Argitakos wanted to speak to him in Greece."[9] However, the brothers did not carry through. Mrs. Panagopolous, during the course of the conversation, informed Steve Argitakos that if called as a witness upon the trial she would tell the truth.

Four or five days later, while Mrs. Panagopolous was at her mother's house in Greece, she received a long distance telephone call from Steve Argitakos, who was still in Greece, to the effect that she must call her husband and "tell him to forget the diner and the house and return to Greece and I will give him a quarter of a million dollars."[10] She at once rejected the offer. She described Argitakos as "savage" and very angry;[11] his tone was as if he were

---

8. Trial transcript at 2729, *supra* note 4.

9. *Id.* at 2735.

10. *Id.* at 2743.

11. Grand Jury Testimony of Joanna Panagopolous at 55, *In Re: Sentry* (S.D.N.Y. September 28, 1983); Trial transcript at 2743, *supra* note 4.

giving a command and he was insistent that her husband had to go to Greece.

Mrs. Panagopolous returned to the States on May 2. She found her husband in "bad shape." [12] She made known to him the $250,000 offer and he agreed with her rejection of it. He told her that he had to go to Greece; that he had been notified by Steve Argitakos that he was to leave the States in order not to testify at the trial.[13] He said he had received the notice indirectly from persons other than Argitakos, but that "Argitakos would fight him" unless he left.[14] Despite her efforts to dissuade him from going, he left for Greece on May 4, within two days after her return to the States, because, as stated by her, "they pressed him and he was afraid, he was scared." [15] She has not seen him since, but he has called several times without revealing his whereabouts. In at least one telephone conversation Panagopolous told his wife that he could not return to the United States to testify at the trial.[16]

In totality, analysis of the entire record compels the conclusion that Steve Panagopolous was convulsed by fear and concern for his safety and that of his family and that his departure for Greece on May 4 and his continued unavailability as a witness, despite the good faith efforts of the government to secure his attendance at this trial, were the direct result of the acts, statements and conduct of Steve Argitakos and others acting on his behalf at his direction; and that the conduct of Argitakos and the others, whether explicit or implied, was intended to prevent the appearance of Steve Panagopolous at the trial. Any other conclusion would fly in the face of reason. While the $250,000 offer made by Steve Argitakos for Panagopolous' nonappearance at the trial was rejected out of hand by his wife and that rejection was acquiesced in by him, it surely reflects Steve Argitakos' intent and gives credence to the charge that the various other acts and statements were calculated to prevent the witness' appearance at this trial. Tested by the standard of clear and convincing evidence, and even by a higher standard of proof,[17] this Court has no doubt that the acts, statements and conduct of the defendant caused and effected the unavailability of the witness and thereby constituted an effective waiver of his right of confrontation of the witness under the Sixth Amendment. To foreclose the use of Panagopolous' grand jury testimony under the circumstances here presented would permit a subversion of a criminal prosecution and "would be contrary to public policy, common sense, and the underlying purpose of the Confrontation Clause ... and make a mockery of the system of justice that the right was designed to protect." [18]

This ruling of waiver makes it unnecessary to consider what our Court of Appeals has referred to as "the difficult legal and constitutional issues arising under the Confrontation Clause and Rule 804(b)(5)." [19] However, the Court does not hesitate to add that the grand jury testimony bears sufficient indicia of trustworthiness to satisfy the criteria of the Rule. The witness was cast in his role by a friend; the experience made a deep impression upon him; the event was of recent occurrence and he was without a motive to testify falsely. He testified under penalty of perjury. Prior to his grand jury testimony he made disclosure to his attorney of the circumstances under which the trunk was lodged in his garage, which was repeated to FBI agents and later sworn to before the

---

12. Trial transcript at 2748, *supra* note 4.

13. This evidence can be considered by the Court pursuant to Fed.R.Evid. 104(a).

14. Trial transcript at 2748, *supra* note 4.

15. Grand Jury Testimony of Joanna Panagopolous at 58–59, *supra* note 11.

16. *Id.* at 61.

17. These are higher standards of proof than required under the rule in this Circuit. *United States v. Mastrangelo*, 693 F.2d 269 (2d Cir. 1983).

18. *United States v. Thevis, supra* note 3, at 630. See also *United States v. Mastrangelo, supra* note 3, at 273.

19. *United States v. Mastrangelo, supra* note 3, at 272.

grand jury. The testimony bears with it circumstantial guarantees of trustworthiness and satisfies the criteria of the rule in that (1) it is evidence of a material fact; (2) it is more probative as to the matters for which it is offered than any other evidence which the prosecution can procure through reasonable efforts; and (3) the interests of justice will be served by the admission of the statement into evidence. Indeed, as already noted, to exclude its admission would subvert the interests of justice and defeat the public's "strong interest in effective law enforcement." [20]

The grand jury testimony will be admitted into evidence, but solely limited to the defendant Steve Argitakos. The codefendants, however, object to its admission even if so limited upon a claim that its spillover effect will unduly prejudice them despite cautionary instructions. The Court does not agree. During the course of the trial the Court from time to time has issued cautionary instructions as to various items of evidence received as to one defendant and excluded as to others. The Court is satisfied that these instructions have been understood and accepted by each and every member of the jury. There is no reason to assume that similar instructions with respect to the grand jury testimony and its final instructions will not be accepted and followed by the jurors. At this stage of the trial, now in its fourth week, this Court has no doubt that it is within the capacity of the jurors to follow the Court's admonitory instructions, to compartmentalize the evidence against each defendant and render a fair verdict as to each.

---

**20.** *Ohio v. Roberts, supra* note 5, 448 U.S. at     64, 100 S.Ct. at 2538.