UNITED STATES of America, Appellee,

v.

John W. SLIKER, John Carbone, and Theodore Buchwald, a/k/a "Bucky," Defendants-Appellants.

Nos. 338 to 340, Dockets 84–1198, 84–1200 and 84–1208.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1984.

Decided Dec. 13, 1984.

Certiorari Denied March 18, 1985. See 105 S.Ct. 1772.

**480**

James R. DeVita, Asst. U.S. Atty., S.D.
N.Y., Rudolph W. Giuliani, U.S. Atty., Paul
Shechtman, Asst. U.S. Atty., S.D.N.Y.,
New York City, for appellee.

Frederick H. Block, New York City, for
defendant-appellant Sliker.

Stanley A. Teitler, Amy Adelson, Richard
H. Levenson, Stanley A. Teitler, P.C., New
York City, for defendant-appellant Car-
bone.

Barry Bassis, The Legal Aid Soc., Feder-
al Defender Services Unit, New York City,
for defendant-appellant Buchwald.

Before LUMBARD, FRIENDLY and
PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

John W. Sliker, John Carbone and Theo-
dore Buchwald appeal from their convic-
tions in the District Court for the Southern
District of New York, after a trial before
Judge Griesa and a jury, on nineteen
counts of a twenty count indictment, all
related to substantially the same transac-
tions. Excluding the third count, which
was dismissed upon the Government's mo-
tion, three counts charged the defendants
with bank embezzlement in violation of 18
U.S.C. § 656, four counts alleged that they
committed bank larceny in violation of 18
U.S.C. § 2113(b), three counts charged
them with transporting stolen property in
interstate commerce in violation of 18
U.S.C. § 2314, and eight counts alleged
that they falsified bank records in violation
of 18 U.S.C. § 1005. Finally, there was
one count alleging a conspiracy to commit
these four offenses in violation of 18 U.S.C.
§ 371. Both Sliker and Buchwald received
concurrent five year sentences on the con-
spiracy and embezzlement charges and on
six of the falsification charges; ten years
on each of the larceny and interstate trans-
portation of stolen property charges, also
to run concurrently; and five years proba-
tion for the remaining two falsification
counts after they had served these sen-
tences. Carbone received concurrent five
year sentences on each of the first seven-
teen counts, and five years probation for
the final two counts of falsification upon
his release from prison. In addition, Car-
bone was fined $1000 on each of the first
ten counts.

The fraud was perpetrated in January,
1981, through the use of checks issued by
the "Bahrain Credit Bank" located in Mont-
serrat, West Indies. In fact, the bank was
a sham, run from the house of Clive Marks,
who would claim to represent the bank and
would respond affirmatively to inquiries
whether the checks were legitimate. By
the time it was discovered that the checks
were in fact worthless, they would have
been cashed.

The Government submitted evidence to
establish the following case: In October or
November, 1980, defendant Buchwald and
Rocco Saluzzi, an unindicted conspirator
who was one of the Government's principal
witnesses, traveled together from New
York to Brussels and endeavored unsuc-
cessfully to use Bahrain Credit Bank
checks for the purchase of diamonds.
Shortly after their return, Saluzzi met with
defendant Carbone, who had apparently
helped to finance Saluzzi's Belgian trip, at

Carbone's furniture store. Carbone sought permission to give Saluzzi's telephone number to someone whom Carbone wanted Saluzzi to meet. According to Saluzzi, Carbone explained that "[h]e's a pretty interesting guy; he's a good mover of paper and I thought you might want to meet him." Shortly thereafter, Saluzzi received a call from defendant Sliker, who explained that he had obtained Saluzzi's telephone number from Carbone. The two met and Saluzzi told Sliker of his ability to obtain offshore bank checks which could "take" a telephone call or telex; Sliker responded that he had connections for disposing of such checks and encouraged Saluzzi to obtain them as quickly as possible. At a subsequent meeting in Carbone's store, Sliker told Saluzzi that Sliker could "take care of" the checks at the Merchants Bank. According to Saluzzi, Sliker claimed that he could work with Bill Foster, a vice-president of the bank, who Sliker stated would be "very cooperative" because Foster was in debt to loansharks for approximately $115,000. Saluzzi then met with Buchwald in order to obtain the checks. Buchwald gave Saluzzi two Bahrain Credit Bank checks, one for $48,760 and the other for $51,240; after Sliker disposed of these as described below, Buchwald gave Saluzzi a third such check for $300,000.

On January 5, 1981, Carbone brought Sliker to the Merchants Bank and introduced him to Foster. Carbone told Foster that Sliker was a good friend and a good businessman and would be a good customer of the Bank. Foster opened an account for Sliker, who deposited $300 in cash.

Sliker returned to the Merchants Bank on January 16, 1981, with a Bahrain Credit Bank check payable to himself in the amount of $48,760, and deposited the check into his account. Foster approved the Bahrain Credit Bank check for immediate credit to enable Sliker to cash a $9,000 personal check; Sliker also opened a savings account by transferring $10,000. Sliker then returned to Carbone's store where Saluzzi was waiting to divide the proceeds. Sliker falsely told Saluzzi he had given $900 to Foster, and another $900 was put aside for

Buchwald to give to the source of the checks; the remaining $7200 was divided equally among Saluzzi, Sliker and Buchwald, who was waiting outside Carbone's store to collect his share. Saluzzi and Buchwald then left together to pay $900 to the source of the checks.

Three days later, on January 19, 1981, Sliker returned to Merchants Bank and deposited the $51,240 Bahrain Credit Bank check, payable to himself, into his savings account. He then cashed another personal check for $9,000, used a second personal check to purchase a $15,000 Merchants Bank cashier's check payable to an Anthony Filone, and used a third personal check to wire transfer $4,000 to an account at a Maine bank. After these transactions, all but approximately $3000 of the funds from the first Bahrain Credit Bank check had been removed from Sliker's checking account. Sliker then took the $9,000 he had received in cash and replayed the scenario that had followed the deposit of the first Bahrain Credit Bank check: He met Saluzzi at Carbone's store, falsely told Saluzzi that he had paid Foster $900, put aside another $900 for Buchwald to pay to the source of the checks, and divided the remaining $7,200 in equal shares among himself, Saluzzi and Buchwald; Saluzzi and Buchwald once again left together to pay the source of the checks his share.

On the morning of the next day, January 20, 1981, Foster received a telephone call from an individual purporting to be an officer of the Bahrain Credit Bank, who said he was calling from Montserrat at Sliker's request in regard to three checks the Bahrain Credit Bank had issued to Sliker, the two checks already deposited and another $300,000 check. The caller assured Foster that the checks were properly issued and would be paid on presentation through regular bank channels. That afternoon Sliker went to Merchants Bank with the $300,000 check, payable to himself. He deposited this in his checking account, and Foster approved it for immediate credit. Using a personal check, Sliker purchased five Merchants Bank cashier's checks payable to

five different payees, totalling $110,200, and a $100,000 Merchants Bank certificate of deposit; he transferred $60,000 from the checking account into his savings account, and directed that a $10,000 Treasury bill be purchased at the next Federal Reserve auction and paid for with funds from his savings account; finally he cashed another $9,000 personal check. These transactions removed all but approximately $20,000 of the $300,000 from Sliker's checking account. The third $9,000 cash payment was handled in the same fashion as the preceding two. On this occasion Sliker also told Saluzzi that he would give Carbone a few hundred dollars for his part in the scheme.

The scheme was premised on Merchants Bank's sending the checks to Montserrat for processing. The sham bank would then stall or claim never to have received the checks, giving the defendants an opportunity to abscond with the proceeds. With the bad luck which fortunately so often attends criminal enterprises, Foster attempted instead to process the three fraudulent checks through the Federal Reserve Bank. On January 21, 1981, Foster learned that the Federal Reserve Bank, which processes only checks drawn on United States banks, had refused to honor the $48,760 and $300,000 checks deposited by Sliker in his checking account as "not payable in the U.S." Foster also learned that the $51,240 Bahrain Credit Bank check, deposited by Sliker into his savings account, had been refused by the Federal Reserve Bank and, in fact, had already been returned to Merchants Bank. Foster called Sliker who promised to take care of the problem by obtaining new checks or a wire transfer. The next morning, Sliker returned to the Merchants Bank, bringing with him two of the cashier's checks he had obtained on January 20, totalling $42,000. Rather than redepositing these into his checking account, Sliker deposited them into his savings account. He asked Foster to return the $51,240 Bahrain Credit Bank check to him, promising to take it back to the people who had given it

to him and obtain a new check on a United States bank or a wire transfer. Foster did so, but agreed to return the other two checks to Sliker when these had been returned to the Merchants Bank only after Sliker had covered the remaining overdraft in the checking account. Foster also asked Sliker to stop writing checks on this account until the matter was resolved. Without Foster's knowledge, however, Sliker returned to the bank that same afternoon and cashed a $7,500 check with approval from another officer. Five days later, on January 27, Sliker brought Foster $7,500 in cash for deposit into Sliker's checking account; he told Foster that he had obtained the money by collecting on a debt. Despite Foster's request, Sliker continued to write checks on this account.

Of course, these events made depositing any more Bahrain Credit Bank checks at Merchants Bank impossible. However, Sliker did not inform his co-conspirators of the problem, and, to prevent them from learning of it, he was forced to go through the motions one more time. When he returned from the bank empty-handed, Sliker concocted a story that he had seen FBI agents talking to Foster, and that Foster had waved him off; Saluzzi told this to Buchwald. Soon after these events, Saluzzi left New York and lost touch with Sliker, Buchwald and Carbone. Buchwald, in the meantime, was arrested on January 22 by the FBI on unrelated charges. In his possession were a $50,000 Bahrain Credit Bank "Official Bank Draft" and a slip of paper with "Bill," "Merchants Bank NY," and Foster's telephone number on it.[1]

Sliker called Foster on January 30, 1981, promising that a $225,000 wire transfer would arrive from Morgan Guaranty Trust Company. No transfer arrived that day, but Foster credited Sliker's account with that amount anyway. When the transfer still had not been made by February 2, after trying unsuccessfully to contact Sliker, Foster went to Carbone's store and

1. The $50,000 check was one that Buchwald had taken to Belgium for use in his aborted attempt to purchase diamonds.

spoke with Carbone about the Bahrain Credit Bank checks. Foster described Carbone as "in shock" and as saying, "I told Jack not to fool around in the bank." Foster also testified that Carbone said he would try to get hold of Sliker and would do his best to straighten out the problem. Foster continued to hide the loss by periodically shifting it among various accounts, but told Carbone and Sliker that something had to be done quickly. In the meantime, Foster took steps to reduce the size of the deficit. Using money Sliker obtained from a friend, as well as the principal from the $100,000 certificate of deposit Sliker had purchased on January 20, Foster reduced the overdraft to approximately $80,000.

Early in July, Carbone requested that Foster come by his store to meet someone, who turned out to be Buchwald. Carbone asked Foster to tell Buchwald what had happened. Foster "gave him the whole story," explaining that Sliker had said that the three bank checks were supposed to represent "a gold transaction." Buchwald replied that "Sliker is full of shit." In November, 1981, Foster resigned from the Merchants Bank. Shortly thereafter he visited Carbone at a restaurant owned by Carbone in Pennsylvania. While Foster was there, Sliker telephoned Carbone and Foster spoke with him. Foster asked Sliker to repay the $80,000 still owed the bank; Sliker requested him to destroy the records or "bury it" at the bank.

Buchwald testified in his own defense. He took the position that although he knew the checks were phoney and were being used to perpetrate a fraud, he did not know that they were to be used to defraud a bank. Carbone also testified and also called three other witnesses. He claimed to have had no knowledge of the fraudulent plan until after it had occurred. Sliker rested his case without testifying or calling any witnesses.

## DISCUSSION

Appellants have made numerous challenges to their convictions. We shall first discuss issues raised on appeal that are applicable to all of the appellants, and shall then deal with issues raised by and relating to each of them individually.

### I. *Issues Relating to All Appellants*

#### A. *FDIC Insurance*

■ It is an essential element of the fifteen counts of the indictment that were submitted to the jury charging bank embezzlement, bank larceny and falsification of bank records that, at the date of the crimes, the Merchants Bank was insured by the Federal Deposit Insurance Corporation ("FDIC"). *See* 18 U.S.C. §§ 656, 1005, 2113(a), (f).[2] The only evidence offered by the Government expressly addressed to proving this was the testimony of Richard Urbano, vice president and controller of Merchants Bank, that the bank's deposits "are" FDIC insured. Carbone's counsel moved on behalf of all three defendants at the close of the Government's case for dismissal of the indictment on the ground that the best evidence rule required the Government to produce a certified copy of the insurance policy itself. The judge correctly denied this motion since the proof required was proof of the fact of insurance and not of the contents of a writing, *see* F.R.E. 1002. Nothing further was said about the issue in the summations. In his charge the judge made plain that one of the elements the Government was required to prove was "that the deposits were insured by the FDIC." The judge stated this twice, moments apart. Between these two statements, he observed that "certain facts are not disputed," among which was that "Merchants Bank undoubtedly has its deposits insured by the Federal Deposit Insurance Corporation." Carbone's counsel objected on the ground that the judge had "failed to instruct the jury that they must find be-

2. Buchwald's assertion that the Government must always prove FDIC insured status is incorrect as each of these statutes provides alternative bases for jurisdiction. However, the indict- ment in this case charged defendants with crimes against a bank "the deposits of which are, and were then, insured by" the FDIC.

yond a reasonable doubt that such was in fact the case." After first promising to submit the issue in the form requested, the judge stated the next day that he did not "intend to say anything about the FDIC" and did not do so, doubtless because he discovered that he already had given the charge that Carbone's counsel requested. Appellants argue that there was no evidence of FDIC insurance at the time of the crime.

Nearly five years ago, the Fifth Circuit, citing a plethora of cases in which courts of appeals had been obliged to consider the adequacy of proof of FDIC insured status, observed that the failure of federal prosecutors to prove such status carefully and convincingly in cases where this was an element of the crime was "a nationwide plague infecting United States Attorneys throughout the land" and warned that "we or our sister courts may some day be faced with an insufficiency of the evidence of insurance which ... would warrant reversal." *United States v. Maner*, 611 F.2d 107, 111–12 (5th Cir.1980). In *Maner*, however, the Fifth Circuit affirmed a conviction where the only evidence of FDIC insurance was a certificate issued 5 years before the offense, and oral testimony by an employee that a 17 year old certificate still hung in the vault, with additional copies posted in public view. The fateful day that had been intimated in *Maner* apparently arrived in *United States v. Platenburg*, 657 F.2d 797 (5th Cir.1981). Evidently finding wisdom in Judge Frank's view that there is only one word that prosecutors truly understand, *see United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 642–46 (2d Cir. 1946) (dissenting opinion), the Fifth Circuit reversed a conviction where the only proof of FDIC insured status was a certificate of insurance that antedated the charged crime by seven years. More recently, but still well before the trial in this case, the Sev-

enth Circuit has twice spoken earnestly on the subject. *See United States v. Knop*, 701 F.2d 670, 672–73 (1983) (sustaining conviction of crime committed two and a half years before trial on basis of testimony that the bank "is" insured by FDIC); *id.* at 676–77 (Posner, J., dissenting); *United States v. Shively*, 715 F.2d 260 (1983) (Posner, J.) (reversing conviction of crime committed in 1978 where only evidence of FDIC insured status was a 1969 insurance certificate), *cert. denied*, —— U.S. ——, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). It is well-nigh incredible that after all this the Department of Justice or, in the absence of action by the Department, a large United States Attorney's office such as that for the Southern District of New York, still has not effectively instructed prosecutors to ask the simple question that would avoid the need for judicial consideration of what should be a non-problem,[3] not to mention the risk of reversal of convictions obtained after great effort by the Government, considerable expense to the public and long service by jurors.[4]

■■■ It is elementary that after a conviction the Government is entitled on appeal to all favorable inferences from the evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Here, the Government can rely on Urbano's testimony viewed in light of the principle that the subsequent existence of a condition is some evidence of its prior existence, at least when the time span is not too great and there is no suggestion of an intervening circumstance that might call its previous existence into question. 2 Wigmore, Evidence, § 437(1) at 513–19 (Chadbourn rev. 1979). We hold, although without enthusiasm, that where, as in this case, the evidence is oral testimony that the bank is insured, and the interval between the crime and the trial is not great, it is reasonable to conclude that "viewed in context,

---

**3.** We understand that in many cases FDIC insurance at the time of the crime is stipulated.

**4.** As pointed out by Judge Pell in *Knop, supra,* 701 F.2d at 672, reversal for insufficiency of the evidence of FDIC insurance at the time of the

crime requires entry of a judgment of acquittal under *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and not simply a new trial. *See United States v. Yakabov*, 712 F.2d 20, 27 (2d Cir.1983).

the jury could draw the inference that the bank was insured at the time of the robbery," *United States v. Safley,* 408 F.2d 603, 605 (4th Cir.1969),—in other words, that this jury could take "is" to mean "is and has been." *Accord Cook v. United States,* 320 F.2d 258, 259 (5th Cir.1963); *United States v. Thompson,* 421 F.2d 373, 379 (5th Cir.1970), *vacated on other grounds,* 400 U.S. 17, 91 S.Ct. 122, 27 L.Ed.2d 17 (1970) (per curiam); *see also Knop, supra,* 701 F.2d at 673.[5] As said in *Cook v. United States, supra,* 320 F.2d at 259–60, while the principle permitting inference of a prior from a subsequent condition "is to be used with caution," "[t]his seems ... to be an appropriate place for its application" in light of "the common knowledge of the nearly universal prevalence of the banks of the United States having their deposits insured by the Federal Deposit Insurance Corporation...." *See also United States v. Phillips,* 427 F.2d 1035, 1037 (9th Cir.1970) (taking judicial notice of fact of FDIC insured status).

■ Defendants argue alternatively that, even if the evidence of the insured status of the Merchants Bank at the date of the crimes was sufficient, the judge improperly removed the issue from the jury's consideration. The record contradicts this claim. The judge made plain that one of the elements the Government was required to prove beyond a reasonable doubt was that the deposits of the bank were insured by the FDIC.[6] Judge Griesa then listed the facts that "are not disputed," the first of which was that Merchants Bank "undoubtedly has its deposits insured" by the FDIC,

and proceeded to instruct the jury on what he considered to be the serious issues in the case. There was in fact no dispute that Merchants Bank "has" its deposits insured by the FDIC, which was all that the judge said. Under his charge the jury still was obliged to determine whether the bank had them insured at the date of the crime. Even as to this there was no "dispute" in the ordinary sense of an issue on which opposing evidence or argument has been presented. The trial judge gave the standard instructions that the jurors were the sole judges of the facts and were required to find facts establishing every element of the offenses charged beyond a reasonable doubt. Viewed in the context of the whole jury charge, *United States v. Tourine,* 428 F.2d 865, 869 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971), Judge Griesa's remarks fell well within "the permissible range of the trial judge's discretion to comment upon the evidence," *United States v. Lombardi,* 550 F.2d 827, 829 (2d Cir.1977); *see generally* 1 Weinstein & Berger, Weinstein's Evidence ¶ 107[07] (1982) [hereinafter cited as Weinstein's Evidence]. We do not think the jury was misled into thinking that it could not render a verdict for the defendants on the basis of a reasonable doubt that Merchants Bank was insured by the FDIC at the time of the crime. *See also United States v. Natale,* 526 F.2d 1160, 1167–68 (2d Cir. 1975) (judge's statements that there was no dispute as to two elements of the offense not erroneous where judge charged the jury that it had to find facts establishing every element beyond a reasonable doubt),

5. Appellants' reliance on *United States v. Henriquez,* 731 F.2d 131 (2d Cir.1984), as having rejected the principle that proof of a condition's subsequent existence can be used to infer its prior existence is misplaced. The issue in *Henriquez* concerned the registry of a ship. The Government sought to establish the statelessness of the vessel in January, 1983 with a February, 1983 certificate of non-registry. However, 1979 registry papers had been on the ship when it was boarded, and the defendant proved that some 500 ships had their registration cancelled in 1983. In light of this, the court found the proof uncertain and remanded under 28 U.S.C. § 2106 for further findings of fact.

6. Judge Griesa charged the jury that FDIC insurance was an element of bank embezzlement, 18 U.S.C. § 656, and bank larceny, *id.* § 2113. He did not mention the FDIC requirement in connection with the counts charging falsification of bank records, *id.* § 1005. This error is clearly harmless inasmuch as only one bank was involved, all counts dealt with the same transactions, and no objection was taken on this score. *Cf. United States v. Singleton,* 532 F.2d 199, 205–06 (2d Cir.1976) (failure to charge every element is not *per se* error requiring reversal).

**486**

*cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976).

### B. *Reasonable doubt*

■ After a page and a half long charge on reasonable doubt to which no objection was made, the court added:

> One final word on this subject. Proof beyond a reasonable doubt does not mean proof to a positive certainty or beyond all possible doubt. If that were the rule, few persons, however guilty, would ever be convicted. It is practically impossible for any of us to be absolutely and completely convinced of any controverted fact unless possibly in the realm of mathematics and I guess there you don't have much controversy.

When counsel objected to this, the court invited counsel to submit a corrective charge, which both the Government and defense counsel agreed to do. The next morning, rather than propose a curative instruction, defendants' counsel contended that the erroneous charge was "very difficult" to correct. The Government submitted a corrective instruction, and the judge expressed his willingness to deliver it, but stated that, in light of the full charge and other statements made throughout the trial instructing the jury as to its duties, he thought the additional charge unnecessary. When defendants objected to the Government's proposed charge, the judge decided to leave the matter alone.

Defendants contend that the "few persons, however guilty, would be convicted" charge was "expressly disapproved" in *United States v. Ivic,* 700 F.2d 51 (2d Cir. 1983). We said in *Ivic* only that this language is "best avoided," but that any error in that respect may be overcome, as was the case there, by the rest of the charge. *Id.* at 69. We also expressly recognized the propriety of instructing that "beyond 'reasonable' doubt does not mean beyond all 'possible' doubt." *Id.* We repeat the observations in *Ivic* concerning the desirability of adhering to the time-tested reasonable doubt charge found in 1 Devitt &

Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977) or using the Federal Judicial Center's new model instruction found in Pattern Criminal Jury Instructions No. 21 (1982), in the absence of evidence that the jury is having trouble in understanding the charge. We nevertheless conclude that Judge Griesa's charge, taken as a whole as it must be, *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400; 38 L.Ed.2d 368 (1973), "successfully conveyed the substance of the concept" of reasonable doubt. *Ivic, supra,* 700 F.2d at 69; *see also United States v. Magnano,* 543 F.2d 431, 436–37 (2d Cir.1976), *cert. denied sub nom. DeLutro v. United States,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). Beyond this, "[h]aving chosen to forego a curative instruction which would have eliminated any substantial chance of error, the defendant may not complain on appeal of the resulting possibility of error." *United States v. Levy,* 578 F.2d 896, 902 (2d Cir. 1978).

## II. *Issues Raised by Buchwald*

In addition to joining the arguments of his co-defendants, Buchwald raises two other issues.

### A. *The Trip to Belgium*

■ Buchwald challenges the admission in evidence of Saluzzi's testimony concerning the trip that he and Buchwald made to Belgium shortly before the fraud upon the Merchants Bank was committed. This evidence was offered pursuant to F.R.E. 404(b) which, after prohibiting admission of evidence of "other crimes, wrongs, or acts ... to prove the character of a person in order to show that he acted in conformity therewith," authorizes the admission of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge" and the like. In this instance, the Government sought to establish the existence of a common scheme or plan; the evidence was offered as probative not only of knowledge and intent, but also of Buchwald's participation in the Merchants Bank scam. *See*

*United States v. Burkley,* 591 F.2d 903, 920 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. Reed,* 639 F.2d 896, 906 (2d Cir.1981). Here, as said by Dean McCormick, the acts were "so nearly identical in method as to earmark them as the handiwork of the accused." McCormick, Evidence § 190 at 559 (Cleary 3d ed. 1984); *see also* 2 Weinstein's Evidence, *supra,* ¶ 404[16] at 404–92–96. Buchwald's contention that the two schemes were not similar since the object of the Belgian expedition was to use phony checks to defraud diamond sellers rather than a bank is without merit. The Belgian and Merchants Bank schemes were identical in every other respect; identical, that is, in the idiosyncratic details by which this particular fraud was perpetuated. Both schemes depended upon the use of phony bank checks issued by the same non-existent offshore bank as well as on prearrangement with an "officer" of the bank to confirm the validity of the checks. The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence. *United States v. Rucker,* 586 F.2d 899, 903 (2d Cir.1978); 2 Weinstein's Evidence, *supra,* ¶ 404[16] at 404–93–94; *see, e.g., Reed, supra,* 639 F.2d at 906 (in both instances defendant had written "bad checks on foreign-based bank accounts to ensure delay in detection"). The evidence was also relevant to demonstrate the development of the Merchants Bank scheme and the reason Saluzzi was so readily able to obtain the phoney checks from Buchwald after Sliker proposed that scheme. *See Magnano, supra,* 543 F.2d at 435; *United States v. Moten,* 564 F.2d 620, 628 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977); *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984).

■ Buchwald contends that his trial counsel's offer to stipulate that Buchwald's only defense was that he did not know that the Bahrain Credit Bank checks were going to be deposited in a bank made the evidence superfluous. Whatever might otherwise be said in regard to this contention, it shatters on the rock that nowhere in the record do we find an expression sufficiently clear to meet the standard set forth in *United States v. Figueroa,* 618 F.2d 934, 942 (2d Cir.1980). Buchwald's contention as to the denial of a limiting instruction likewise fails. Rather than deliver a contemporaneous instruction proposed orally, Judge Griesa chose to delay the instruction until his final charge, a decision generally within the judge's discretion. *See United States v. Dabish,* 708 F.2d 240, 243 (6th Cir.1983) ("timeliness of such an instruction is best left to the trial judge's discretion" so that it was not error to instruct in the general charge to the jury); 1 Weinstein's Evidence, *supra,* ¶ 105[05] at 105–37. When the judge brought up the subject at the charging conference, Buchwald's trial counsel said he preferred that no limiting instruction be given. *See Levy, supra,* 578 F.2d at 902. Finally, there is no merit to the contention that the judge did not explicitly engage in the balancing test of F.R.E. 403. The issues of both the probative value and possible prejudicial effect of admitting this evidence were presented to the judge when he made the decision to admit it. A "mechanical recitation of Rule 403's formula as a prerequisite to admitting evidence," *United States v. Sangrey,* 586 F.2d 1312, 1315 (9th Cir.1978), is not required. *See United States v. Figueroa, supra,* 618 F.2d at 943; *United States v. Hayes,* 553 F.2d 824, 828 (2d Cir.), *cert. denied,* 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977); *United States v. DeJohn,* 638 F.2d 1048, 1052–53 (7th Cir.1981); *United States v. Bradshaw,* 690 F.2d 704, 709 (9th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). Moreover, the evidence was "not necessarily prejudicial in any sense that matters to the rules of evidence," *United States v. Figueroa, supra,* 618 F.2d at 943 (citing *United States v. Briggs,* 457 F.2d 908, 911 (2d Cir.), *cert. denied,* 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972)), namely, that the probative value of the evidence is "substantially

outweighed by the prejudicial tendency of the evidence to have some other adverse effect on the defendant," *id.; see United States v. Medico,* 557 F.2d 309, 317–18 (2d Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977).

## B. *The Bahrain Credit Bank Records*

Buchwald's second point relates to the admission in evidence of papers seized by the Royal Montserrat Police in executing a search warrant on the "Bahrain Credit Bank," which turned out to be the home of Clive Marks, on May 2, 1981. The records included a telephone and address book in which Buchwald's name and telephone number were recorded; a telex relating to Buchwald's Belgian diamond deal; a ledger and index cards that recorded numerous checks issued by the Bahrain Credit Bank, including the three checks deposited by Sliker at Merchants Bank and the check seized from Buchwald incident to his arrest; and a yellow pad diary with several references to Buchwald, Foster, Sliker and the three checks deposited at Merchants Bank. The records were admitted in connection with the testimony of Deputy Superintendent Griffith of the Montserrat Police, who testified that he seized them in the course of his search of Marks' house, and that Marks had been present throughout the search. Griffith testified that Marks had written some of the seized papers, basing his opinion on his having seen Marks write on two occasions and having observed his signature on travelers' checks that were seized in the search. Buchwald objects that the papers were insufficiently authenticated in that Griffith was not competent to identify Marks' handwriting, and that the documents, or some of them, constituted inadmissible hearsay.

F.R.E. 901(a) provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The Advisory Committee's Notes state that "[a]uthentication and identification represent a special aspect of relevancy .... The requirement ... falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)" under which the judge may conditionally admit the evidence, subject to the jury's ultimate determination as to its genuineness. *See* F.R.E. 104(b), Advisory Committee Notes. Hence the rule requires the admission of evidence "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." 5 Weinstein's Evidence, *supra,* § 901(a)[01] at 901–17; *see also United States v. Natale, supra,* 526 F.2d at 1173.

The type and quantum of evidence necessary for authentication is thus related to the purpose for which the evidence is offered. These papers, with their many references to the passing of checks issued by a so-called bank in Montserrat, including the checks used by these defendants to perpetuate the fraud on the Merchants Bank, were offered to prove the part of the scheme that required the existence of a sham offshore bank. The papers were relevant no matter who their author was. All that was needed was sufficient proof for a jury to find that they were connected to the bank that issued the checks used to defraud the Merchants Bank and that the Government alleged was a sham. F.R.E. 901(b)(4) provides that "[a]ppearances, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances" provide a means of authenticating evidence. The contents of these documents, taken in conjunction with Deputy Superintendent Griffith's testimony that they were seized at the purported office of the bank, provided adequate basis to establish their authenticity. *See United States v. Wilson,* 532 F.2d 641, 644–45 (2d Cir.) (contents together with fact that notebooks were found at apartment where crime was committed were sufficient to establish authenticity), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976); *United States v. Bagaric,* 706

F.2d 42, 67 (2d Cir.) (contents of letter found in defendant's home sufficient to authenticate), *cert. denied,* —— U.S. ——, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983).

■ The hearsay objection is likewise meritless. Most of the papers were not hearsay at all; they were admitted not to establish the truth of the matters asserted but rather to prove the sham nature of the bank and to link the defendants to it. As with the address book in *United States v. Panebianco,* 543 F.2d 447, 456–57 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977), "what is probative is the mere existence of the entry rather than the meaning intended by the writer." *See also United States v. Ruiz,* 477 F.2d 918, 919 (2d Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); *United States v. Head,* 546 F.2d 6, 9 (2d Cir.1976), *cert. denied sub nom. Wheaton v. United States,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). To whatever extent there was danger—and Buchwald has not demonstrated this—that the jury might consider the records to constitute assertions by Marks, such statements would be admissible under F.R.E. 801(d)(2)(E) (statements by a coconspirator). *See United States v. Ziperstein,* 601 F.2d 281, 294 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980); *see also Ohio v. Roberts,* 448 U.S. 56, 67, 100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1980) (firmly rooted hearsay exceptions establish reliability sufficiently for Sixth Amendment purposes). For this purpose, Griffith's testimony could have qualified under Rule 901(b)(2) to authenticate Marks' handwriting. *See In re Goldberg,* 91 F.2d 996, 997 (2d Cir.1937) (witness saw three checks signed); 5 Weinstein's Evidence, *supra,* ¶ 901(b)(2)[01] at 901–30. In any event, any problem regarding use of the records as proof of the matter asserted could easily have been cured by a limiting instruction which Buchwald's attorney failed to request. *See United States v. Rothman,* 463 F.2d 488, 490 (2d Cir.), *cert. denied,* 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231 (1972); *Levy, supra,* 578 F.2d at 902.

### III. *Issues Raised by Sliker*

#### A. *The Denial of Daily Copy*

■ The trial judge denied Sliker's request that, as an indigent defendant, he should receive daily copy of the transcript, at the Government's expense, when the Government and Carbone, an allegedly antagonistic co-defendant, received it. During the ten day trial, both the Government and defendant Carbone made their transcripts of daily copy available to Sliker's counsel, who read from them in his summation. In addition, the court offered to have portions of the reporter's tape read to Sliker's counsel if he needed and also to make his own apparently extensive notes available. Sliker argues nevertheless that because the Government and Carbone received daily copy and he did not, his rights under the Due Process Clause and under the equal protection component of that clause were violated. His principal reliance, *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), does not support him. Justice Black's plurality opinion in that case, which became a majority disposition through Justice Frankfurter's concurrence in the judgment, dealt with an Illinois statute that required the defendant to furnish the appellate court with a bill of exceptions or report of proceedings certified by the trial judge in order to obtain appellate review of trial errors. Both opinions, and particularly the concurring opinion, emphasized the total bar to appellate review of trial errors created for indigents like Griffin by the Illinois statute. *See id.* at 13–14, 16, 76 S.Ct. at 588, 589 (plurality opinion), 22–24, 76 S.Ct. 592–593 (Frankfurter, J., concurring). Nothing in the opinions suggested that the state had an obligation to furnish an indigent defendant with every convenience that a wealthier one might enjoy. To the contrary, Justice Black suggested that Illinois might overcome the problem by allowing "bystanders' bills of exceptions," *id.* at 20, 76 S.Ct. at 591 (plurality opinion)—surely not the equal of a copy of the transcript in

preparing an appellate brief or argument. *See also id.* at 23–24, 76 S.Ct. at 592–593 (state need not "equalize economic conditions" of all accuseds in relation to putting on a defense).

*Griffin v. Illinois* was not, however, to be the Court's last word on the rights of indigents in the criminal justice process. As said in Kamisar, LaFave and Israel, Modern Criminal Procedure 136 (5th ed. 1980), "[i]n the decade and a half following *Griffin*, its underlying principle was broadly applied." Perhaps most significant in the present context are *Long v. District Court of Iowa*, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) (per curiam) (indigent must be furnished a free transcript of a state habeas corpus hearing for use on appeal from denial of the writ although state law did not make its availability a necessary prerequisite to full appellate review); *Robert v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 141 (1967) (per curiam) (indigent defendant entitled to free transcript of preliminary hearing for use at trial); *Gardner v. California*, 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (1969) (indigent prisoner entitled to free transcript of lower court habeas proceeding in bringing a new petition before a higher state court); and *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) (indigent may be entitled on retrial to transcript of previous trial that ended with hung jury). These cases, only one of which is cited by Sliker—and this by mere reference, and none of which is cited by the Government, thus go well beyond the holding of a bare majority in *Griffin* that a free transcript must be provided for an appeal where lack of such a transcript or a substitute barred appellate review. In *Britt*, Justice Marshall announced, without dissent on this score, that

*Griffin v. Illinois* and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal.

404 U.S. at 227, 92 S.Ct. at 433 (footnote omitted). He went on to state:

Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.

*Id.* at 228, 92 S.Ct. at 434 (footnote omitted). As the Court was later to explain, these decisions are derived partly from the Equal Protection Clause and partly from the Due Process Clause of the Fourteenth Amendment, although each of these clauses depends "on a different inquiry which emphasizes different factors," *Ross v. Moffitt*, 417 U.S. 600, 608–09, 94 S.Ct. 2437, 2442–43, 41 L.Ed.2d 341 (1974): " 'Due Process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated[,] 'Equal Protection,' on the other hand, emphasizes disparity in treatment between classes of individuals whose situations are arguably indistinguishable," *id.* The Court has not, however, had occasion to deal with the problem of the provision of daily copy to indigents under either source of the rulings just cited.[7]

The Government tells us that "[t]he law is settled that the provision of daily tran-

---

**7.** There are several references to daily copy in dissenting opinions in the cases discussing indigents' rights to a free transcript for purposes of appeal. Justice Harlan, dissenting in *Gardner v. California, supra,* characterized it as "an incidental convenience" not guaranteed to criminal defendants by the Fourteenth Amendment. 393 U.S. at 372, 89 S.Ct. at 583. Later references

tend to suggest a different conclusion on the part of the authors, but do not say this in unequivocal terms. *See Britt, supra,* 404 U.S. at 235 n. 6, 92 S.Ct. at 438 n. 6 (Douglas, J., dissenting); *United States v. MacCollom,* 426 U.S. 317, 337 n. 3, 96 S.Ct. 2086, 2097 n. 3, 48 L.Ed.2d 666 (1976) (Stevens, J., dissenting).

script to an indigent defendant is not essential to a fair trial and that the decision to provide daily copy is therefore committed to the sound discretion of the trial judge," Government Brief at 48–49, citing *United States v. Rucker, supra,* 586 F.2d at 905, and *United States v. Kaufman,* 393 F.2d 172, 176 (7th Cir.1968), *cert. denied,* 393 U.S. 1098, 89 S.Ct. 892, 21 L.Ed.2d 789 (1968).[8] In *Rucker,* after referring to *Kaufman,* this court held:

> This was a relatively short trial, lasting only four days. Defense counsel had all of the accomplice witnesses' prior testimony and statements, and diligently exploited inconsistencies therein in cross-examination and summation. Smith has not shown any prejudice suffered as a result of the denial of the daily copy. The refusal of the trial court to order daily copy for the defendants was not an abuse of discretion, nor did it violate the defendants' rights to a fair trial.

586 F.2d at 905.

Even without this authority, we would conclude that the failure to provide Sliker with daily copy at the Government's expense violated neither the due process nor the equal protection considerations that have governed the Supreme Court's decisions in this area. Common experience informs us that it is entirely practicable to present an effective defense in a criminal case without daily copy, however convenient daily copy undoubtedly is. This was particularly true with respect to Sliker's defense here. The case presented no issues of ultimate fact; Sliker's defense apparently was that he did not know that the checks were phoney—a position so utterly implausible that daily copy could hardly have assisted in establishing it. Moreover, between the offers of the prosecutor and Carbone's attorney to permit Sliker's counsel to examine their transcripts, and the judge's offer to make his own notes available or to have the reporter's tape read to counsel, we have no doubt that Sliker was

afforded "other means" that were "adequate and effective," as permitted by the Court. *Griffin, supra,* 351 U.S. at 20, 76 S.Ct. at 591; *see also Draper v. Washington,* 372 U.S. 487, 495, 83 S.Ct. 774, 779, 9 L.Ed.2d 899 (1963) ("[A] state need not purchase a stenographer's transcript in every case where a defendant cannot buy it.... Alternative methods of reporting trial proceedings are available....") Turning to equal protection, we see no indication that the Court is prepared to insist upon requiring a state to provide indigent defendants with every convenience that it or a wealthier defendant can afford. To the contrary, recent decisions from the Supreme Court seem to have put something of a cap on the principle recognized in *Griffin* and its progeny. In *United States v. MacCollum,* 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976), the Court upheld the constitutionality of 28 U.S.C. § 753(f), which provides that the trial judge must certify that a claim to be raised in a habeas corpus proceeding under 28 U.S.C. § 2255 is "not frivolous" before indigent defendants can obtain a free transcript. The plurality observed that

> neither the Equal Protection Clause of the Fourteenth Amendment, nor the counterpart equal protection requirement embodied in the Fifth Amendment, guarantees "absolute equality or precisely equal advantages," .... In the context of a criminal proceeding, they require only "an adequate opportunity to present [one's] claims fairly...."

426 U.S. at 324, 96 S.Ct. at 2091 (citations omitted). The concurring opinion made the same point: "Nor does the Constitution require that an indigent be furnished every possible legal tool, no matter how speculative its value, and no matter how devoid of assistance it may be, merely because a person of unlimited means might choose to waste his resources...." *Id.* at 330, 96 S.Ct. at 2093. *See also Ross v. Moffitt, supra,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (limiting the right to free coun-

---

**8.** Examination of the briefs in these cases shows that the Government did not receive daily copy

in either *Rucker* or *Kaufman.*

sel on appeal recognized in *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) to initial appeals as of right). Although district judges, in the exercise of their authority under 18 U.S.C. § 3006A(e), should carefully consider the possible desirability of providing indigent criminal defendants with at least one daily copy, at least in long trials and when the prosecution is receiving it, the judge's denial of Sliker's request for such copy on the facts of this case was not an abuse of discretion or a denial of Sliker's constitutional rights.

### B. *Other Claims*

 Sliker's remaining contentions are easily disposed of. Sliker contends that the court erred in denying a motion under Fed.R.Crim.P. 14 for a severance on the ground that he had formerly been a federal informant and had disclosed documents relating to Carbone. As the notes of the Advisory Committee and abundant authority indicate, Rule 14 accords wide discretion to the district judge in ruling on such motions. *See, e.g., United States v. Carpentier*, 689 F.2d 21, 27 (2d Cir.1982) (must show "substantial prejudice" before appeals court will reverse), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983); *United States v. Burke*, 700 F.2d 70, 83 (2d Cir.) (committed to "broad discretion of trial court" which will not be overturned without showing not merely some prejudice, but denial of a fair trial), *cert. denied*, —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Cody*, 722 F.2d 1052, 1061 (2d Cir.1983) (same), *cert. denied*, —— U.S. ——, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); Fed.R.Crim.P. 14,

Notes of Advisory Committee. The necessary level of abuse of discretion was not even approached here. As Judge Weinfeld said in *United States v. Papadakis*, 572 F.Supp. 1518 (S.D.N.Y.1983):

> A party claiming prejudice must show more than mere hostility between one or more defendants.... Instead, to establish a level of antagonism between the defenses of the codefendants that compels severance, petitioner must show that "the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant."

*Id.* at 1521 (quoting *Carpentier, supra*, 689 F.2d at 27–28); *see also United States v. Barber*, 442 F.2d 517, 530 (3d Cir.1971), *cert. denied*, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). There was no such inconsistency here. While Buchwald was driven to admit that he knew the Bahrain Credit Bank checks were phoney, Sliker's defense that he did not is not inconsistent in the relevant sense. And, even if Buchwald's ultimate admission of knowledge of the bogus nature of the checks worked against Sliker, this would have been equally true had Buchwald testified at a later separate trial. Carbone's defense—that he had no part in the scheme—was not inconsistent with Sliker's position at all.[9]

Sliker makes much of the fact that after he had rested his case without testifying, Carbone's counsel called "as our first witness for defense, defendant John W. Sliker." Sliker's counsel immediately objected and the jury was excused; Sliker's counsel

9. Sliker suggests, alternatively, that, not having granted his severance motion, the court erred in allowing Sylvester Accardo, who was called by the prosecution, and Albert Ricci, who testified in Carbone's defense, to testify about their dealings with Sliker. Sliker contends that this evidence was irrelevant and tended only to show that he was an unsavory character. We do not understand the relation between Accardo testimony and Sliker's severance motion; Accardo's testimony was offered mainly to implicate Sliker and would have been offered at a separate trial. Moreover, Accardo's testimony was directly relevant: the Government sought to show that Sliker used Accardo both to test the scheme and to delay discovery of the misappropriation. This testimony was unquestionably admissible under F.R.E. 404(b). The immediate relevance of Ricci's testimony is less apparent. Carbone claims that Ricci's testimony that references in Sliker's notebook to loan repayments to "J.C." were not references to Carbone rebutted the Government's implications concerning Carbone's motives. However, even if this testimony was erroneously admitted against Sliker, any error was harmless in light of the overwhelming evidence of Sliker's guilt.

then moved for a mistrial. Carbone's counsel informed the court that he had spoken with Sliker who had agreed to testify for Carbone. However, after a rather heated exchange between Carbone's and Sliker's counsel, it became clear that, having obtained permission from Sliker's counsel to interview Sliker in order to get an affidavit for a motion by Carbone for severance, Carbone's counsel went on to request that Sliker testify on behalf of Carbone without informing Sliker's counsel. After a recess during which Sliker consulted with his counsel, Sliker told the court under oath and outside the presence of the jury that his agreement to testify had been contingent upon a prior opportunity to consult with the other defense attorneys. An associate of Carbone's counsel, also under oath, denied this. The result was that Sliker decided not to testify. The jury was recalled and Carbone's counsel announced that "after due deliberation we have decided not to call Mr. Sliker...." The judge followed this up by advising the jury that the episode "is nothing for you to draw any inferences from. It was a matter of a little misunderstanding and it's been cleared up. Please don't speculate about it. It doesn't change the trial in any respect."

Sliker relies upon *United States v. Housing Foundation of America, Inc.*, 176 F.2d 665 (3d Cir.1949), as holding that the above described events violated his Fifth Amendment rights against self-incrimination. In that case, one defendant, Westfield, was compelled, over his objection, to give 14 pages of testimony in support of a co-defendant. During a recess the trial judge looked up 28 U.S.C. § 632 (currently codified at 18 U.S.C. § 3481), which provided that a criminal defendant shall be a competent witness "at his own request but not otherwise," and terminated the examination. The judge later struck the testimony and charged the jury that it should not be influenced by Westfield's failure to testify or by the stricken testimony. In reversing Westfield's conviction, the Court of Appeals said that forcing Westfield to take the stand violated not only the statute but the self-incrimination clause of the Fifth Amendment as well. Being understandably indignant about the episode, the court did not discuss why the judge's instruction did not cure the serious error.

Sliker's case is easily distinguishable. Westfield was literally "compelled in [a] criminal case to be a witness against himself," the very thing the self-incrimination clause most clearly forbids; Sliker was not. Indeed, Sliker was not even required to claim his privilege in the presence of the jury. Any inference the jury might otherwise have drawn that he had done so in the jury's absence was dispelled by the statement of Carbone's counsel after the recess that it was he who had decided not to call Sliker. Finally, the judge, instead of waiting for his final charge like the judge in *Housing Foundation,* instructed the jury immediately and decisively. Although Sliker should not have been called, the incident, as handled by the judge, did not infringe his constitutional privilege. *See also Coleman v. United States,* 420 F.2d 616, 625 (D.C.Cir.1969) (in view of overwhelming evidence, it was harmless error for counsel of codefendant to call defendants to testify and to argue defendant's assertion of privilege in his closing argument).

[redacted] Sliker's remaining claim is of insufficiency of evidence to convict him on counts 2 and 4, which charged bank embezzlement in violation of 18 U.S.C. § 656 with respect to the deposit of the $48,760 and $300,000. Section 656 was violated when money was withdrawn from the bank on the credit of the phoney checks. This required that Sliker be given immediate credit to his account when he deposited these checks; otherwise, he would not have been allowed to withdraw money from the account before the checks cleared, an event that would never occur with these checks. Sliker contends that the testimony showed that giving immediate credit on these checks was Foster's idea and that the Government acknowledged that Foster was not in the conspiracy at the time. Therefore, Sliker concludes, there was insufficient evidence to find that he, Sliker, had violated § 656. Even if the premises were

accepted, the conclusion does not follow. There was abundant proof from which the jury could conclude that Sliker caused Foster to pay out the bank's monies improperly on the basis of the bogus checks. Thus he could be found "guilty as a principal even though the agent who committed the act [was] innocent...." *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir.1979); *see also United States v. Gleason*, 616 F.2d 2, 20 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); 18 U.S.C. § 2(b).

## IV. *Issues Raised By Carbone*

### A. *The Sufficiency of the Evidence*

 Carbone's first challenge is to the sufficiency of the evidence against him. Starting from the conceded premise that there is no direct proof that he knew of the plan to use checks of the sham Bahrain Credit Bank to defraud the Merchants Bank, he contends that the circumstantial evidence relied on by the Government consisted of four isolated facts—that he introduced Sliker to Saluzzi, that he introduced Sliker to Foster, that his store was used for various meetings between the conspirators, and that Sliker was indebted to him. Carbone argues that, even applying the rules that after a conviction the defendant's burden to show insufficiency is a "very heavy" one, *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied sub nom. Mont v. United States*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and that the evidence must be viewed in the light most favorable to the Government with all permissible inferences drawn in its favor, *Glasser v. United States, supra*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983), the evidence adduced in this case was insufficient for a reasonable jury to find him guilty beyond a reasonable doubt. *See United States v. Vuitch*, 402 U.S. 62, 72 n. 7, 91 S.Ct. 1294, 1299 n. 7, 28 L.Ed.2d 601 (1971); *Soto, supra*, 716 F.2d at 991–93. Carbone places particular emphasis on the absence of proof that he directly benefitted from the scheme, pointing out that the only

proof of a direct benefit was Saluzzi's statement that Sliker said that he would pay Carbone a few hundred dollars for his part in the scheme—a rather trifling sum for which to undergo the risk of criminal prosecution.

Although the question is close, we do not accept Carbone's claim. While none of the four pieces of evidence cited by Carbone would alone constitute a reasonable basis for finding him guilty beyond a reasonable doubt, this is not the way in which evidence should be viewed. As we have often said, "pieces of evidence must be viewed not in isolation but in conjunction," *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir. 1969), for "each of the episodes gain[s] color from each of the others," *United States v. Monica*, 295 F.2d 400, 401 (2d Cir.1961), *cert. denied*, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). *See also United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir.1977); *United States v. Barnes*, 604 F.2d 121, 156 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Carson, supra*, 702 F.2d at 362. The evidence takes on a quite different aspect when viewed in this light: Carbone first financed a trip to Belgium by Saluzzi to accompany Buchwald for the purpose of defrauding diamond sellers with phoney Bahrain Credit Bank checks; shortly after the failure of that mission, Carbone arranged the introduction of Saluzzi, who owed Carbone money, to Sliker, who also owed Carbone money and was a "good mover of paper" in Carbone's words; Carbone made his store available for the hatching of a plot to defraud the Merchants Bank, escorted Sliker to the bank to meet his easily gulled friend, Foster, and then on three other occasions made his furniture store available again for the division of loot among the conspirators. A reasonable jury could, of course, conclude that Carbone was the unfortunate victim of deception and coincidence, but we cannot say that an equally reasonable jury could not be convinced beyond a reasonable doubt that Carbone had his finger rather deep in the Merchants Bank pie. Moreover, the

Government introduced some further evidence that the jury could have considered in finding Carbone guilty. First, the Government brought out a contradiction to Carbone's exculpatory statement that he had gone to the Merchants Bank on January 5 with Sliker because a bank officer had called while Sliker was with him to tell him that his account was overdrawn.[10] The Government also cast doubt on Carbone's testimony that he was outraged when told of the fraud on February 2, 1981, by playing for the jury a tape recording of a telephone conversation between Sliker and Carbone on January 7, 1982 (of which more hereafter) in which Carbone had a friendly conversation with Sliker and told Sliker that he did not "give a goddam" about Foster's "60, or whatever it was 80"—apparently referring to the portion of the misappropriated money that had not been made good; that "we pushed [it] off to the side, he ain't getting it;" and that "I'm not going to worry about Bill. What you did there, that money is gone." The jury could also have given weight to what it could reasonably have concluded was a lie by Carbone in claiming not to recognize his own voice on the tape, and in at first denying but later admitting that he recognized Sliker's voice, *see infra.* There was thus enough evidence to justify the jury in concluding that Carbone was guilty beyond a reasonable doubt.[11]

### B. *The Severance Motion*

Carbone's second claim is that the judge abused his discretion in denying Carbone's motion for a severance under Fed.R. Crim.P. 14. Severance was requested to permit Sliker to testify that Carbone had no knowledge of the plan to defraud the Merchants Bank. The motion was made on the first morning of the trial, and was supported only by oral statements of counsel for Carbone that Buchwald would exculpate Carbone at a later trial. The judge denied the motion but gave leave to counsel to submit authority on the issue and reargue it the next day. The next morning Carbone's counsel renewed the motion, again orally and still without authority, this time claiming that both Sliker and Buchwald were prepared to exculpate Carbone at a subsequent trial of Carbone. When Carbone's counsel sought to call Sliker and Buchwald to the stand in order to attest to the fact, their attorneys balked. However, Buchwald's attorney stated that Buchwald would testify at a subsequent trial; Sliker's attorney was unwilling to give such assurances. The judge again denied the application, concluding that counsel's statements were no substitute for the affidavits of their clients, and that Carbone had made an insufficient showing to split apart a trial that logically should be kept whole. After all the parties had rested, on the ninth day of trial, Carbone's counsel produced an affidavit from Sliker, averring that Carbone was unaware of the true nature of Sliker's dealings with Foster and with Merchants Bank, and also that Sliker himself had been duped by Saluzzi who led him to believe that the phoney checks were good but that Saluzzi needed someone else to cash them because he was on probation. Sliker's counsel protested that the affidavit had been obtained in breach of a promise that he be allowed to see the affidavit before Sliker signed it, and that Sliker "stupidly signed it without my knowledge or consent." Although Carbone's counsel offered the affidavit in evidence on theories apparently unintelligible to anyone, he did not renew his application

---

**10.** Carbone's reply brief asserts that the account did become overdrawn during the day. However, the bank records cited by Carbone establish not more than that he may have been overdrawn for part of the day on January 2; they also show that any overdraft was ended by the close of business on that day. The uncontroverted testimony was that he went to the bank with Sliker on January *5.* In any event, this was an issue for the jury to determine.

**11.** The jury may also have been influenced by Carbone's demeanor, which twice led the judge to reprimand him. Although it is a legitimate factor for the jury to consider, this could not remedy a deficiency in the Government's proof if one existed. *See United States v. Marchand,* 564 F.2d 983, 986 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *cf. Dyer v. MacDougall,* 201 F.2d 265, 268–69 (2d Cir.1952) (L. Hand, J.).

for a severance, and the judge properly excluded it. As Carbone acknowledges, since Buchwald took the stand in his own defense and testified as to his lack of knowledge of Carbone's participation in the scheme, the only issue on appeal is whether severance should have been granted to let Sliker testify on Carbone's behalf.

In *United States v. Finkelstein*, 526 F.2d 517 (2d Cir.1975), *cert. denied sub nom. Scardino v. United States*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976), we identified four factors to be weighed in determining whether to sever the trial of a defendant who contends that a co-defendant would offer exculpatory testimony at a separate trial. These are as follows:

(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege ...; (2) the degree to which exculpatory testimony would be cumulative ...; (3) the counter arguments of judicial economy ...; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment....

*Id.* at 523–24 (citations omitted). The judge was warranted in concluding that Carbone had failed to pass any of these tests except the second, and thus his denial of the motion to sever was not an abuse of discretion. *See Carpentier, supra,* 689 F.2d at 27; *Burke, supra,* 700 F.2d at 83.

With respect to the first factor, the judge was not required to accept the statements made by Carbone's counsel on the morning when the trial was to begin, particularly since Sliker's own attorney refused to endorse these statements and said that he would "have to discuss it" with Sliker first. *United States v. Siegel,* 717 F.2d 9, 22 (2d Cir.1983). Even if Carbone accurately states the facts in maintaining that he had difficulty in communicating before the trial with Sliker, who had been confined at the Federal Bureau of Prisons Medical Center in Missouri, this claim could no longer have been made later, when Sliker was confined at the Metropolitan Correctional Center. Indeed, an associate of Carbone's counsel

did interview him there once it became apparent that Judge Griesa was going to require a sworn statement by Sliker. He obtained an affidavit, dated April 5, 1984, but counsel did not present this until all parties had rested on April 9. At that time, as observed above, Carbone did not renew his motion for a severance.

With respect to the third factor, we fail to see the basis for Carbone's assertion that "[a] separate trial of Carbone would have been much shorter than a Sliker-Buchwald trial," Brief for Carbone at 36, in the absence of any stipulation by Carbone as to what he would concede at such a trial. Finally, with respect to the fourth factor, Sliker would have been subject to devastating impeachment. He had numerous prior arrests for fraud related crimes, had jumped bail after one recent arrest, and had five fraud cases pending against him in Pennsylvania; the Government could have been allowed to inquire into all these, although not to prove them by extrinsic evidence. *Compare* F.R.E. 608(b) *with* F.R.E. 609(a). In addition, the Government represents that it had in its possession a statement given by Sliker to the FBI in which he said that the cash proceeds of fraudulent checks had been divided equally between himself, Saluzzi and Carbone and that he had given most of his share to Carbone as payment on a loansharking debt; this statement could have been used to cross-examine Sliker, and its making proved by extrinsic evidence. F.R.E. 613(b).

C. *The Admission of the Tape of the January 7, 1982 Conversation with Sliker*

Carbone makes several arguments relating to the admission into evidence of a tape recording of a telephone conversation between him and Sliker on January 7, 1982, which the Government was allowed to play to the jury during his cross-examination. After Carbone professed an inability to recall the conversation, the prosecutor sought to refresh his recollection by having him listen to a tape of it, stating that if this should fail, he would offer the tape in

evidence. After listening to the tape on an earphone, Carbone was asked whether the tape refreshed his recollection; Carbone replied: "Not too much." When asked whether he tape recorded a conversation between him and Sliker, he responded:

I refuse to answer. I'm not sure. I take the Fifth on that one.

Questioned whether he recognized his own voice, Carbone answered in the negative, adding "I never heard myself on tape." Questioned whether he recognized Sliker's voice, Carbone answered "[n]ot that much." The prosecutor then offered the tape, asking the judge if he would like to listen to it "for the voice identification." The judge did so, the prosecutor then offered the tape,[12] and Carbone's counsel objected.

At a sidebar conference the judge noted that the tape was very clear and stated that "it is clear that it is Mr. Carbone's voice." Carbone's counsel argued that "[t]he court can't be a witness against my client to authenticate—with regard to voice identification." Observing that "I am just acting as the judge," Judge Griesa overruled this objection. The tape was then played to the jury.[13] In addition to showing cordiality and continued dealings between Carbone and Sliker and thus contradicting Carbone's testimony that Sliker's conduct had outraged him and discrediting Carbone's assertion that he had threatened Sliker's life after learning of the fraud, the tape showed that both Sliker and Saluzzi were heavily indebted to Carbone, thereby providing a motive for Carbone to bring them together in an endeavor that might provide them with funds.

Carbone raises two related arguments regarding the authentication of this tape. First, he claims that the judge improperly "testified," in violation of F.R.E. 605, that it was Carbone's voice on the tape. Second, he claims that since no one ever testified before the jury that it was Carbone's voice on the tape, no proper foundation was laid for its admission into evidence. Discussion of these objections requires some preliminary analysis.

In order for a piece of evidence to be of probative value, there must be proof that it is what its proponent says it is. The requirement of authentication is thus a condition precedent to admitting evidence. However, whether a given piece of evidence is authentic is itself a question of fact. Contrary to the first branch of Lord Coke's maxim, *ad quaestionem facti non respondent judices; ad quaestionem juris non respondent juratores* (judges don't answer questions of fact; juries don't answer questions of law), the common law rule was that the judge and not the jury should decide "any preliminary questions of fact, however intricate, the solution of which may be necessary to enable him to determine ... the admissibility" of evidence. Thayer, Preliminary Treatise on Evidence 258 n. 3 (1898) (quoting *Gorton v. Hadsell*, 9 Cush. 508, 511 (Mass.1852)). The justification for this principle centered on the supposedly limited abilities of juries and on the circularity of having a jury hear evidence in order to determine whether it should hear the evidence. *See* Maguire & Epstein, *Preliminary Questions of Fact in Determining the Admissibility of Evidence*, 40 Harv.L.Rev. 392, 393–95 (1926); McCormick, *supra*, § 53 at 135.

Despite the recognized rule we have just described, the maxim that fact-finding is for the jury carries considerable force. Leaving too much for the judge to decide would "greatly restrict[ ] and in some cases virtually destroy[ ]" the functioning of the

---

**12.** The prosecutor wavered as to whether the tape's admissibility for a purpose other than impeachment was as a prior inconsistent statement, which it clearly was not in the sense required by F.R.E. 801(d)(1) or as an admission, which it clearly was, *see* F.R.E. 801(d)(2). He offered it on both bases.

**13.** After the tape was played, the prosecutor asked whether the "Bill" referred to on the tape was Bill Foster and Carbone answered affirmatively. An objection by Sliker's counsel that his client's voice had not been authenticated led the prosecutor to question Carbone a second time whether he recognized Sliker's voice on the tape; this time Carbone admitted that he did.

jury as a trier of fact. F.R.E. 104(b), Notes of Advisory Committee. Thus, exceptions were made to the common law rule stated above. Maguire & Epstein, *supra,* 40 Harv.L.Rev. at 395–413 (citing cases). A few courts, for example, allowed the jury to hear dying declarations with instructions to consider the preliminary question whether the declarant spoke with a settled, hopeless expectation of death. *See Conway v. State,* 177 Miss. 461, 171 So. 16–17 (1936); *State v. Dotson,* 96 W.Va. 596, 123 S.E. 463, 463–64 (1924). Other courts submitted preliminary fact questions on the competence of evidence to the jury where these corresponded with an ultimate disputed factual issue. *See, e.g., Hitchens v. Eardley,* 2 L.R.–P. & D. 248, 249–50 (1871) (defendants seek to admit hearsay statements on basis that declarant was related to decedent and was discussing family history in will contest in which only issue is relationship with decedent). *See generally* Maguire & Epstein, *supra,* 40 Harv.L.Rev. at 408–30.

F.R.E. 104 retains the principles thus developed at common law. Subsection (a) provides that

> [p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).

Subdivision (b) provides:

> When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Thus, subsection (a) governs questions concerning the competency of evidence, i.e., evidence which is relevant but may be subject to exclusion by virtue of some principle of the law of evidence, leaving it for the judge to resolve factual issues in connection with these principles. *Cf. United States v. Eskow,* 422 F.2d 1060, 1069 (2d Cir.1970) ("We have repeatedly emphasized that it is for the court to make the initial

determination of a preliminary issue upon which competency of evidence depends." (citing cases)). Examples include not only those expressly stated in the rule (privileged information and witness competency), but others such as the hearsay rule, based on the policy of excluding inherently unreliable evidence; the exclusionary rule, designed to insure the observance by police of Fourth or Fifth Amendment rights; and many others. 1 Weinstein's Evidence, *supra,* ¶ 104[01] at 104–10; *see, e.g., United States v. Mastropieri,* 685 F.2d 776, 778 (2d Cir.) (judge alone should decide existence of conspiracy for purposes of admitting co-conspirator's statements), *cert. denied sub nom. Pate v. United States,* 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982). Removing factual issues related to determining whether evidence is competent from the jury is based on recognition that the typical juror is intent mainly on reaching a verdict in accord with what he believes to be true in the case he is called upon to decide, and is not concerned with the long term policies of evidence law. McCormick, *supra,* § 53 at 135.

Subsection (b) provides different treatment for situations in which the *relevancy* (i.e., probative value) of evidence, rather than its *competency,* depends upon the existence of a prior fact. *United States v. James,* 590 F.2d 575, 579 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); 1 Weinstein's Evidence, *supra,* ¶¶ 104[01] at 104–9, 104[09] at 104–71; McCormick, *supra,* § 53 at 137–38. Judge Weinstein explains why the Federal Rules leave such issues to the jury:

> This exception to the judge's broad power under Rule 104(a) is based on the theory that these questions of conditional relevance are merely matters of probative force, rather than evidentiary policy, and that the jury is competent to receive the evidence-in-chief and still disregard it if they find the non-existence of the preliminary fact.

1 Weinstein's Evidence, *supra,* ¶ 104[01] at 104–10.

The requirement that a given piece of evidence be what its proponent claims does not reflect some special evidentiary policy like hearsay rules or privileges. Wigmore described the need for authentication as "an inherent logical necessity." 7 Wigmore § 2129, *supra,* at 703 (emphasis omitted). Authentication is perhaps the purest example of a rule respecting relevance: evidence admitted as something can have *no* probative value unless that is what it really is. *Cf.* Notes of Advisory Committee to Rule 901(a). Thus, the Notes of the Advisory Committee accompanying Rule 901 state that questions concerning authentication are governed by the procedures in Rule 104(b). *See also O'Neal v. Morgan,* 637 F.2d 846, 850–51 (2d Cir.1980), *cert. denied sub nom. Esty v. O'Neal,* 451 U.S. 972, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981); *In re Japanese Elec. Prods. Antitrust Litigation,* 723 F.2d 238, 284–85 (3d Cir.1983).

██ Under Rule 104(b), the trial judge may make a preliminary determination as to the prior fact and admit the evidence to the jury's final determination that the prior fact exists. *See O'Neal, supra,* 637 F.2d at 850–51. That is what Judge Griesa did here; as he succinctly put it, he was "just acting as the judge." He listened to the tape and determined, based on his own comparison of the voices, that there was sufficient evidence of the prior fact (that the voice on the tape was Carbone's) to admit the evidence for the jury to hear. This is the course which this court has recommended, *United States v. Bryant,* 480 F.2d 785, 789 (2d Cir.1973); *see also United States v. Carson,* 464 F.2d 424, 436–37 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972), although it would have been preferable for the judge to have done it in camera. As shown by the Advisory Committee's Note, Rule 605 is addressed to an entirely different situation, namely, situations where the judge presiding at the trial forsakes the bench for the witness stand or engages in equivalent conduct. *See also Kennedy v. Great Atl. & Pac. Tea Co.,* 551 F.2d 593, 597–98 (5th Cir.1977) (judge's law clerk testified at trial); *Price Bros. Co. v. Philadel-*

*phia Gear Corp.,* 629 F.2d 444, 446–47 (6th Cir.1980) (judge gathered evidence in bench trial), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). Carbone's first claim is thus without merit.

The judge's preliminary determination does not, however, finally establish the authenticity of the tape. As with other matters under Rule 104(b), only the jury can finally decide that issue. The judge's admission of the evidence under Rule 104(b) is conditional and "subject to the introduction of evidence sufficient to support a finding of the fulfillment of the condition." F.R.E. 104(b). We thus reach the question whether there was evidence before the jury sufficient to establish that the voice on the tape was Carbone's. Carbone claims there was not. While the Government does not squarely address the issue in its brief, its basic position must be that hearing the tape after having heard Carbone's voice when he testified provided the jury with sufficient evidence to conclude that the voice on the tape was Carbone's.

F.R.E. 901(a) requires "evidence sufficient to support a finding that the matter in question is what its proponent claims," but does not definitively establish the nature or quantum of proof that is required. *Cf.* F.R.E. 901(a), (b), Notes of Advisory Committee. Subsection (b) provides illustrations of what will suffice. Subsection (b)(5), dealing specifically with the question of voice identification, states that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording," can be established "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Carbone argues that the opinion referred to must be that of a witness and not that of the trier of the fact, and the Notes of the Advisory Committee suggest that this is so, as does Judge Weinstein, 5 Weinstein's Evidence, *supra,* ¶¶ 901(b)(5)[01], [02]. However, subsection (b)(5) is only an illustration and several of the other illustrations do not require opinion testimony and leave it to the jury to make its own comparison. Sub-

section (b)(3), for example, states that authentication of a writing may be established by "[c]omparison by the trier of fact ... with specimens which have been authenticated." Similarly, subsection (b)(4) permits a finding of authenticity based on "distinctive characteristics, taken in conjunction with circumstances." *See* F.R.E. 901(b)(3), (4), Notes of Advisory Committee; *see, e.g., Bagaric, supra,* 706 F.2d at 67 (letter authenticated based on contents and location at which it was found). We thus see no reason in principle why, in a case like this, where the person whose voice on a tape is to be identified has testified, the jury cannot itself make the comparison. Had the judge put this question to them, that would end this matter. *Cf. United States v. Rizzo,* 492 F.2d 443, 448 (2d Cir.) (rejecting challenge to authentication because the "jury was properly instructed" that the Government had to prove that voice on tape was defendant's), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Cambindo Valencia,* 609 F.2d 603, 640 (2d Cir. 1979) (jury was instructed that it must judge worth of testimony of witness who heard a voice exemplar in determining if tape was authenticated), *cert. denied sub nom. Prado v. United States,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). Here, moreover, the Government's case was aided by Carbone's identification of the "Bill" referred to on the tape as Foster and of the other voice as Sliker's, *see* note 10, *supra.*

 Such difficulty as exists comes from the fact that the question was not specifically put to the jury, which might have assumed that the judge had ruled that the voice was Carbone's, not merely preliminarily, but definitively. However, the jury knew there was an issue since it had heard Carbone disclaim ability to identify the voice as his own, and the judge delivered the appropriate instruction in his general charge to the effect that the jury was the ultimate judge as to all factual issues. We understand the general rule to be that the judge is permitted but not required to deliver a specific instruction to the jury to con-

sider particularly any preliminary question under Rule 104(b). *See* 1 Weinstein's Evidence, *supra,* ¶ 104[09] at 104–72. Particularly where, as here, counsel fails to request such an instruction, *cf.* F.R.E. 105, the decision whether or not to give one lies in the discretion of the trial judge. Undoubtedly it would have been better to have delivered such an instruction here. However, we see no reason why Judge Griesa was required to fear that a juror who, having just heard Carbone testify, thought that the voice on the tape was not Carbone's would have felt constrained to assume that it was. It was thus not an abuse of discretion for him to have failed to instruct the jury *sua sponte* that it must specifically decide this issue of authentication.

 Carbone's remaining contentions in regard to the tape can be disposed of in short order. Relying on the opinion of the district judge in *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y. 1958), which this circuit has not fully adopted, *see United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.), *cert. denied sub nom. Sansone v. United States,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977), Carbone claims that the Government did not adequately demonstrate the accuracy of the tapes. This point was not raised below, where it might have been resolved by the trial judge, and thus may not be raised for the first time on appeal. *See United States v. Fuentes, supra,* 563 F.2d at 531 (failure to object to authentication and accuracy of tape recordings). The judge correctly ruled that the tape's contents were relevant, since as we have already indicated, they tended both to impeach Carbone's testimony and to provide a motive. Carbone objects, however, that reference on the tape to his loansharking activities should have been excluded under F.R.E. 404(b), and that the judge did not engage in the weighing process of F.R.E. 403, which might have led him to redact these references. We note that this evidence, because it was used to show motive, was clearly admissible under Rule 404(b).

In any event, these objections too, not having been made to the trial court, cannot be raised on appeal. *See United States v. Gigante,* 729 F.2d 78, 84 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984).

The judgments of conviction are affirmed.